THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
June 11, 2009

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Morgan Creek Productions, Inc.

v.

Foria International, Inc.

_____

Opposition No. 91173806
to application Serial No. 78730599
filed on October 11, 2005

_____

David J. Kera and Carol L.B. Matthews of Oblon, Spivak, McClelland, Maier & Neustadt, P.C. for Morgan Creek Productions, Inc.[1]

Mark Fang, Esq. for Foria International, Inc.

_____

Before Seeherman, Wellington and Ritchie, Administrative Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Morgan Creek Productions, Inc. has opposed the application of Foria International, Inc. to register MORGAN CREEK OUTFITTERS, in standard character format, for camp

---

[1] Jonathan Hudis and Jeffrey H. Kaufman of the same firm entered their appearances after briefing was completed. Mr. Kera and Ms. Matthews were the attorneys listed on the trial brief and other papers filed in the proceeding.

shirts, dress shirts, golf shirts, knit shirts and shirts.[2]

The word OUTFITTERS has been disclaimed.

As grounds for opposition, opposer has alleged that it owns registrations for the trademark MORGAN CREEK and design for pre-recorded motion picture films and for pre-recorded phonograph records, audio tapes, audio cassettes and compact disks featuring musical entertainment; that opposer has used the trademark MORGAN CREEK for caps, t-shirts, and baseball shirts since prior to applicant's use; that applicant has made no use of its mark in connection with clothing since prior to February 1, 2005, the date of first use asserted by applicant in its application; that opposer has promoted its MORGAN CREEK mark in the entertainment industry worldwide, and "its trademarks are well and favorably known" to the trade and purchasing public in the United States; that applicant's clothing products are legally identical to the goods on which opposer uses its MORGAN CREEK mark; and that applicant's mark so resembles opposer's previously used and registered MORGAN CREEK and design mark as to be likely, when applied to shirts, to cause confusion or mistake or to deceive.[3]

---

[2] Application Serial No. 78730599, filed October 11, 2005, asserting first use on February 1, 2005 and first use in commerce on July 1, 2005. The drawing in the application depicts the mark in upper and lower case (with each word capitalized), but no claim was made to any particular font, style, size or color.
[3] Opposer has variously referred to its trademark in the singular and plural, sometimes in the same sentence, e.g.,

2

In its answer applicant admitted opposer's allegations regarding opposer's ownership of registrations for MORGAN CREEK and design[4] and that applicant did not use its mark prior to February 1, 2005, and otherwise denied the allegations in the notice of opposition. Applicant also asserted a number of "affirmative defenses" which, for the most part, amplify its denials of opposer's allegations regarding likelihood of confusion.[5]

The record includes the pleadings; the file of the opposed registration by operation of Trademark Rule 2.122(b)(1); and the testimony, with exhibits, of opposer's

---

"Petitioner [sic] has extensively promoted and advertised its MORGAN CREEK mark [sic] in the entertainment industry worldwide, and its trademarks [sic] are well and favorably known to the trade and purchasing public in the United States." ¶ 4. "…OPPOSER's previously used and registered trademarks [sic] MORGAN CREEK & Design…." ¶ 5. Viewing the notice of opposition as a whole, it appears that opposer is claiming rights for the single mark MORGAN CREEK and design. However, even if we treat the pleading as asserting use of the trademark MORGAN CREEK per se for clothing, it would have no effect on the outcome of this proceeding.

[4] The registration number opposer provided for its registration for motion picture films, No. 1651507, was incorrect, as that registration number identifies a registration for the mark THE ANSWER that was owned by an individual and was cancelled in 1998. However, opposer subsequently submitted Registration No. 1615507 for MORGAN CREEK and design for pre-recorded motion picture films and videos for general entertainment purposes, and it is obvious that the reference to No. 1651507 was a typographical error. Applicant's admission of the allegation is deemed to be an admission that opposer is the owner of Registration No. 1615507; further, the pleading is deemed to be amended to reflect the correct registration number.

[5] Applicant did assert "estoppel" as an affirmative defense, namely, that opposer has been using its mark in the entertainment industry for more than ten years, and that, if it "were truly concerned about the use of the mark in class 025 [clothing], it has had ample time to register the mark properly." Applicant did not pursue this asserted defense in its brief and we therefore have given it no further consideration.

3

witness Howard Kaplan and applicant's witness Timothy Wu. Opposer has submitted, under a notice of reliance, status and title copies of its pleaded registrations, namely, Registration No. 1615507 for MORGAN CREEK and design (also referred to herein as the "logo"), as shown below, for "pre-recorded motion picture films and videos and general entertainment purposes"[6] and Registration No. 1857493 for "pre-recorded phonograph records, audio tapes, audio cassettes and compact discs featuring musical entertainment."[7]



In Registration No. 1615507 the "creek design" is lined for the color blue, but no claim was made to color.

---

[6]  Issued October 2, 1990; Section 8 & 15 affidavits accepted and acknowledged; renewed.
[7]  Issued October 11, 1994, Section 8 & 15 affidavits accepted and acknowledged; renewed.

4

Applicant submitted, under notice of reliance, copies of its own applications (one abandoned) and a registration originally obtained by applicant but subsequently assigned, for various marks, none of which is similar to the mark at issue herein; opposer's responses to applicant's interrogatories, requests for production of documents, and requests for admission; webpages taken from various websites; and telephone directory printouts.  We note that some of these materials may not be made of record by notice of reliance.  However, opposer has treated the entire notice of reliance as being of record (opposer's brief, p. 2), and we therefore deem these materials to be stipulated into the record.[8]

Opposer and applicant have filed trial briefs.[9]

---

[8]  Subsequently, at pages 16-17 of its brief, opposer reviewed the evidence submitted by applicant and contended that much of it is irrelevant.  As part of this review, opposer asserted that the Internet pages submitted by applicant with its notice of reliance are irrelevant or incompetent, and also that they do not refer to printed publications and therefore do not qualify as evidence. In view of opposer's prior statements, we do not regard any of these comments as objections to the admissibility of the evidence, but merely as going to their probative value.  We add that, whether or not the Internet pages were considered, they would not affect our decision herein.

[9]  Opposer marked certain paragraphs of its brief as "confidential," although the statements made in these paragraphs do not appear to be confidential.  For example, on page 8, a "confidential" paragraph merely states the numbers of the exhibits that refer to expenditures for advertising and publicity.  Although the exhibits themselves are confidential, the numbers of the exhibits are not.  Further, the only evidence that has been submitted under seal is certain exhibits to the Kaplan testimony; none of the actual testimony of Mr. Kaplan was marked confidential.  Because the record of Board proceedings must be open to the public, only truly confidential material should be marked as such.  See TBMP §120.02.  Accordingly,

The record shows that opposer is in the business of film production and distribution, and has been in business for over twenty years. It has produced such films as Ace Ventura, Robin Hood, Last of the Mohicans and Man of the Year, and its films have starred such actors as Al Pacino, Jim Carrey and Kevin Costner. Opposer's logo always appears onscreen in its films.

Opposer also sells videos of all of its movies. Originally they were in the form of video cassettes, but since 1998 or 1999 they have been principally in the form of DVDs. The logo appears on the back of the packaging, and sometimes on the spine as well. More than $200 million worth of videos have been sold in the United States.[10] In addition, opposer sells copies of the soundtracks of many of its movies, and has sold more than 5 million in the United States. Originally they were sold in the form of record albums, then audio cassettes, and now they are sold as CDs. The logo appears on the packaging. The DVDs and CDs are

---

opposer is allowed thirty days to submit a redacted brief in which only information that is truly confidential is deleted, failing which the original brief will become part of the public record.

[10] At page 25 of his deposition Mr. Kaplan testified that sales of DVDS and cassette tapes in the United States were "north of $200 million," and repeated that in answer to counsel's following question, "in excess of $200 million." p. 26. At p. 37, after being asked about the number of CDs opposer has sold, he was again asked, "DVDs you told us in excess of," to which he replied "my best guess is 200 million." Because of the prior testimony, in which the word "dollar" was repeated, we consider the 200 million figure to refer to the dollar value of the DVDs sold, rather than the number of DVDs.

sold through retail outlets such as Best Buy, Wal-Mart, Target, bookstores and DVD shops.

Opposer advertises its movies using trailers, network and cable television spots, radio, buses and billboards, the Internet, newspapers and magazines. With the exception of radio, the logo is always displayed in the advertising. Approximately 25,000 to 35,000 posters are distributed throughout the country prior to the opening of a film.

In addition to its motion pictures, and DVDs and CDs associated with the motion pictures, at one time opposer produced 43 episodes of an Ace Ventura cartoon television program that was televised on the CBS network; the logo appeared on the screen. It has also sold two computer games, one based on Ace Ventura and one based on the cartoon film The King and I, in which the MORGAN CREEK logo appears on the box.

Opposer also puts its logo on promotional items that are distributed free of charge. Many of these promotional items are given to people directly involved with its motion pictures. For example, opposer puts its logo on Titleist golf balls, which are given away to people involved in the distribution of its films and to the people who worked on the movies, ranging from a star of the movie to someone who did some minor errands on the movie.

Applicant sells men's and ladies' sportswear. In 2004 it chose the name MORGAN CREEK OUTFITTERS for an outdoor-oriented clothing line. They chose the mark because applicant's sales representative lived on Morgan Creek Road, and they added OUTFITTERS to convey a more specific and vintage feel. The MORGAN CREEK OUTFITTERS line is sold exclusively to and by Tractor Supply Company, which is a farm and ranch store chain catering to people in rural areas. Applicant has sold MORGAN CREEK OUTFITTERS products in commerce since the autumn of 2005, with 30-40 different items that fall into 6-8 categories. Among the MORGAN CREEK OUTFITTERS items applicant sells are tops, woven shirts, knit shirts, t-shirts, shorts, pants, hats and bandannas.

We must first consider a procedural issue. After the close of trial, and indeed, on the date opposer's trial brief was due,[11] opposer filed a motion to amend the pleadings, along with an amended pleading. Applicant has contested this motion. By its motion opposer seeks to add a ground of fraud on the basis that applicant did not use its mark on "dress shirts," one of the goods listed in the identification of goods in the application. Although

---

[11] On the same date, April 24, 2008, opposer filed a motion to extend its time to file its brief, stating that, "substantial progress has been made on writing the brief, but that an additional two weeks are requested in order to complete the brief, revise, it, and file it." The Board's March 16, 2009 order, which considered multiple post-trial motions, granted this motion and treated the brief filed on May 1, 2008 as timely.

opposer has argued that applicant was put on notice at the time of Mr. Wu's testimony deposition that opposer intended to move to amend the pleading to include a ground of fraud, the basis for opposer's motion is that the issue of fraud was tried by the implied consent of the parties. Because opposer is not moving to amend pursuant to Fed.R.Civ.P. 15(a), there is no issue with respect to whether opposer's motion to amend was timely raised, or whether the three-plus months from the January 2, 2008 testimony deposition until the motion to amend was filed on April 24, 2008 constituted an undue delay that was prejudicial to applicant. The only question we must consider is whether the issue of fraud was in fact tried, and therefore whether the pleadings should be deemed to be amended pursuant to Fed.R.Civ.P. 15(b).

Fed.R.Civ.P. 15(b) provides, in pertinent part, that when issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. It is clear from applicant's opposition to the motion to amend that applicant did not expressly consent to the trial of the issue of fraud. As for whether there was implied consent, implied consent to the trial of an unpleaded issue can be found only where the nonffering party (1) raised no objection to the introduction of evidence on the issue, and (2) was fairly apprised that the evidence was

9

being offered in support of the issue.  TBMP Section

507.03(b) (2$^{d}$ ed. revised 2004).

The testimony involving whether the issue of fraud was

tried arose during the cross-examination of applicant's

witness, Mr. Wu, at pages 55-64.  There were several

questions relating to "dress shirts," beginning with the

witness's definition of a "dress shirt," and continuing with

the various features of a dress shirt, e.g., "Is it a

button-down shirt?"; "Do the collar pads button down?."  At

the point that opposer's counsel asked whether applicant

manufactured any dress shirt for Tractor Supply Company

applicant's counsel began interjecting what we would

characterize as clarifying questions: "Counsel, are you

referring to under the Morgan Creek Outfitters label or

not?"; "And again, this is dress shirt as defined by Mr.

Wu's definition--personal definition?."  There then followed

some exchanges between counsel, e.g.:

> Applicant's counsel:  So in other words,
> as far as you know, is there a dress
> shirt that would go with a tie—
>
> Opposer's counsel:  I'm asking the
> questions.
>
> Applicant's counsel:  No, I'm
> paraphrasing it for you.
>
> Opposer's counsel:  This is cross-
> examination.  Please do not interrupt.
> I want a yes or a no answer from the
> witness.  If he does not understand the
> question, let him tell me, and I'll
> rephrase.

10

Applicant's counsel then objected to the next two questions on the basis that they were vague and ambiguous, and opposer's counsel accused applicant's counsel of coaching the witness. After some additional questions and answers, applicant's counsel accused opposer's counsel of badgering the witness, and admonished him about the tone of his voice. The acrimonious nature of the exchanges between counsel continued, with applicant's counsel claiming that opposer's counsel was taking the witness's words out of context, and that his question was causing confusion, and "I think you understand the confusion that you're causing the witness."

At virtually the end of this line of cross-examination opposer's counsel said to applicant's counsel:

> I'm putting you on notice that I'm going
> to move to amend the opposition to
> include a charge of fraud in the patent
> and trademark office on the grounds that
> the application includes dress shirts
> which were not sold under the mark prior
> to the filing of the application.

Applicant's counsel replied, "You can do whatever you want." Applicant's counsel took no redirect testimony whatsoever. As noted, the Board has found that an issue was tried by implied consent where the non-offering party raised no objection to the introduction of evidence on the issue and in its brief treated the evidence as being of record, or discussed the issue in its brief as though it were part of

11

the pleading.  This situation often arises when a plaintiff relies during trial on a registration that it had not previously pleaded.  See, for example, Boston Red Sox Baseball Club LP v. Sherman, 88 USPQ2d 1581, 1583, n. 3 (TTAB 2008) ("The notice of reliance also includes status and title copies of several registrations which were not pleaded in the notice of opposition.  Because applicant has not objected to opposer's reliance on the unpleaded registrations, and moreover has, in effect, treated them as of record in his brief, we deem opposer's pleading amended to assert the registrations under Fed.R.Civ.P. 15(b)").

The present situation is somewhat different, in that applicant's counsel did not specifically object to opposer's line of questions on the basis that they were irrelevant because the issue of fraud had not been pleaded.  However, in viewing this entire line of cross-examination, it appears to us that as soon as it became clear to applicant's counsel what the import of opposer's questions were, applicant's counsel began interposing objections.  As a result, we cannot say that applicant consented to the issue of fraud being tried.[12]

Nor can we say that applicant realized that the cross-examination was intended to be the entire trial of the issue

---

[12]  The better practice would have been for applicant's counsel to have objected to the line of questioning on the ground that fraud was not a pleaded issue.

of fraud. Although opposer's counsel notified applicant's counsel that he intended to move to amend the pleading to add the ground of fraud, we cannot view opposer's counsel's statement and applicant's retort thereto as the equivalent of showing that the issue of fraud was actually tried. Inasmuch as opposer points only to Mr. Wu's testimony deposition as evidencing that the issue was tried by consent, the consent should be clearly shown from the deposition questions and responses. Opposer's counsel's statement at the conclusion of this line of testimony that he was putting applicant on notice that he was going to move to amend the pleading cannot, after the fact, show that an issue was tried. Because a motion to amend can be based on newly obtained information, applicant could have understood opposer's "notification" as advising applicant that it intended to seek leave to amend under Federal Rule 15(a), and to reopen the proceeding, including reopening discovery and testimony, in order to add the ground of fraud. Indeed, it appears that applicant did interpret the notification in that manner, as its brief in opposition to the motion discusses the untimely nature of the motion, i.e., the time that passed between opposer's obtaining the information and opposer's filing of the motion to amend. The fact that applicant took no redirect after the testimony with respect to dress shirts was elicited on cross examination is a

13

further indication that applicant did not regard the issue of fraud as having been tried.

The question of whether an issue was tried by consent is basically one of fairness. The non-moving party must be aware that the issue is being tried, and therefore there should be no doubt on this matter. This is especially true if the issue is purportedly tried solely through the plaintiff's cross-examination of the defendant's witness, since the plaintiff had the opportunity through its pleading to advise the defendant of the grounds it wished to pursue, and also had the opportunity, if new grounds came to its attention, to file a motion to amend the pleading under Fed.R.Civ.P. 15(a). Because there is a question as to whether applicant was aware that Mr. Wu's testimony on cross-examination was to be the entire evidence on the issue of fraud, we cannot conclude that the ground of fraud was tried by consent. Accordingly, we deny the motion to amend.[13]

---

[13] The better practice, in a situation where the basis for a new ground becomes evident during a testimony deposition, is to file a motion to amend the pleadings pursuant to Fed.R.Civ.P. 15(a), rather than to rely on answers adduced during cross-examination to show that an unpleaded issue was tried by consent. Such a motion, however, must be filed as soon as the basis therefor is known in order to be considered timely.

We point out that, even had we granted opposer's motion, the testimony elicited by opposer on cross-examination is insufficient to prove fraud "to the hilt" with clear and convincing evidence. Smith International, Inc. v. Olin Corp., 209 USPQ 1033, 1044 (TTAB 1981). For example, there is some ambiguity as to whether some of the shirts sold by applicant would be considered dress shirts. Although Mr. Wu responded to

Opposer has established its standing in this proceeding through its registrations for MORGAN CREEK and design and its use of this mark.  Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); Lipton Industries, Inc. v. Ralston Purina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

This brings us to the issue of priority and likelihood of confusion.  Although opposer alleged in its notice of opposition that applicant's clothing is legally identical to the goods on which opposer uses its MORGAN CREEK mark, in its brief opposer has concentrated its argument on likelihood of confusion in view of opposer's registration and use of MORGAN CREEK and design for motion pictures, sound recordings of motion picture sound tracks, and videos

---

one question that applicant's line did not include dress shirts as of the filing date of applicant's application, he also testified that a dress shirt was "a button-down shirt with a collar" that was "a yarn-dyed woven."  p. 55.  Exhibits 20 and 21 to Mr. Wu's testimony show a shirt with a button-down collar that buttons vertically down the front.  Subsequently he was asked whether a dress shirt is designed to be worn with a tie, and he answered, "Dress shirts, yes.  Sounds like it.  Because it's more formal."  p. 55.  At another point Mr. Wu testified that applicant's "solid shirts can be worn with a tie."  p. 57.  As previously discussed, the questions on this subject were interrupted by objections from applicant's attorney as to the vagueness of the questions and badgering of the witness, and complaints by opposer's attorney that applicant's counsel was coaching the witness.  There are contradictions in Mr. Wu's testimony as to whether he would characterize some of applicant's goods as dress shirts, and it is not clear from the testimony whether on an objective assessment these shirts would appropriately be characterized as dress shirts.  Indeed, Mr. Wu testified that his definition of a "dress shirt" may be different from the definition accepted in the industry.  The limited testimony on cross-examination does not satisfy the burden for proving fraud.

15

in the form of cassettes and DVDs. For example, in discussing the relatedness of the goods, opposer has argued that the goods do not have to be competitive or even similar for confusion to be likely. Opposer does not make the argument that applicant's clothing is identical to opposer's goods. We will therefore begin our analysis with the likelihood of confusion with respect to opposer's motion pictures, videos and audio products.

In view of opposer's pleaded registrations for MORGAN CREEK and design, as discussed above, which are of record, priority is not in issue. King Candy Company v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). Moreover, the record shows that opposer has used its mark for motion pictures, videos and CDs[14] since prior to applicant's first use of its mark.

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, In re Majestic Distilling Co., Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

We turn first to consider the factor of fame, since when fame is present it plays a dominant role in the

---

[14] Opposer used its mark on record albums and audio cassettes even earlier than it used its mark on CDs, but opposer now uses its mark only in the CD format for its audio products.

16

determination of likelihood of confusion. See Bose Corp. v. QSC Audio Products Inc., 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); Recot Inc. v. M.C. Becton, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); Kenner Parker Toys, Inc. v. Rose Art Industries, Inc., 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Opposer has been using its MORGAN CREEK logo for over twenty years. It spends millions of dollars advertising and promoting each motion picture it produces,[15] and based on sales figures for tickets, opposer's witness gave a general range for the number of people who have seen opposer's films, saying that "150 million is probably on the low side and 250 million is probably on the high side." Kaplan test., p. 22. The length of use and the numbers provided by opposer seem substantial at first glance. However, in the slightly more than twenty years it has been in business, opposer has produced 34 movies.[16] It is not clear from the record whether this would be considered a small number of films compared to the total number of films that are distributed in the United States each year. Nor has opposer provided evidence as to how the attendance for its films

---

[15] Opposer marked as "confidential" the portion of its brief indicating the range of its expenditures. However, we note that the actual testimony of Mr. Kaplan in which the figures were given was not marked confidential nor submitted under seal. Although in an excess of caution we have refrained from reporting those numbers here, they are in the public record.

compares to the attendance for other films. Opposer has provided no context for these numbers in terms of comparing the sales figures over the same period with those of others, or comparing the number of movies opposer produces with the number of films produced each year, or showing opposer's market share compared with that of other production companies or motion picture studios, or even comparing opposer's annual advertising expenditures with those of other production companies or movie studios. As the Federal Circuit has stated: "Raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading … Consequently, some context in which to place raw statistics is reasonable." Bose Corp. v. QSC Audio Prods., 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002).

As for the print advertising that has been submitted, and even the packaging for the CDs and DVDs, the logo appears in relatively small size, so that it is not likely to be noticed. For example, the focal point of the posters is the title of the film, the names of the actors starring in it, and a picture of the actors or something significant in the film. The logo appears at the bottom of the poster, along with a listing of the producers and various people

---

[16] Mr. Kaplan testified that exhibit 141 contained trailers for

associated with the film, from the stars to the editor, production designer and person who did the music. We acknowledge that the logo appears quite prominently at the beginning of the films themselves and at the beginning of each trailer, as it takes up the full screen (although even in these cases opposer's logo appears after the equally prominent logo of the company that distributes the films for it, i.e., Warner Brothers in the past and now Universal). However, in considering the various uses on the goods and the advertising, we cannot conclude, based on this record, that the exposure to the logo has resulted in its making a strong impression on the general public.

Opposer also made of record an issue of The Hollywood Reporter featuring opposer's 20th anniversary. The cover of the issue, dated May 8-14, 2007, prominently displays opposer's logo and the words "Celebrating 20 Years." The cover also has the word "Advertisement" on it, and the issue itself has numerous ads congratulating opposer. The record contains no information as to whether The Hollywood Reporter singled out opposer for this issue because of its reputation in the industry, or whether it does this for many companies as a revenue-raising technique. In any event, the fact that opposer has received this publicity in a trade paper is not

all but two of its movies. The DVD has 32 trailers.

19

significant in terms of showing that the general public is familiar with opposer's logo.

It is the duty of a party asserting that its mark is famous to clearly prove it. Leading Jewelers Guild Inc. v. LJOW Holdings LLC, 82 USPQ2d 1901, 1904 (TTAB 2007). Because of the lack of context for opposer's sales and advertising figures, and the manner in which the mark is displayed in many of the advertisements and packaging for the product, we find that opposer has not met this burden.[17]

Although on this record we have found that opposer's logo is not a famous mark, the evidence is sufficient to show that it is a strong mark for motion pictures. Applicant has submitted evidence taken from the Internet, such as yellowbook.com, that lists various companies and places with "Morgan Creek" in their names. For example, there is a Morgan Creek Apartments in Tampa, FL; Morgan Creek Farms in Hope, KS; and Morgan Creek Development in Huntington, NY. There are also webpages from Morgan Creek Vineyards, www.morgancreekvineyards.com, and Morgan Creek Grill, www.morgancreekgrill.com, and Morgan Creek Golf & Country Club, www.morgancreekclub.com. There is also

---

[17] It is not entirely clear that opposer considers its mark to be "famous" for purposes of the du Pont analysis. Although opposer has stated that the fame of the prior mark is an important du Pont factor, the concluding sentence of the single paragraph of its brief that discusses this factor is that "MORGAN CREEK is a well-known name and mark." Brief, p. 19.

evidence that indicates "Morgan Creek" is a place name:   the website for University of North Carolina references the "Morgan Creek watershed," ncbg.unc.edu, while a website with an Idaho address states that the Morgan Creek Recreation Site campground is "along scenic Morgan Creek," and the Encyclopaedia Britannica lists "Morgan Creek" as appearing on a map showing parts of Oklahoma and Texas.[18]   None of this evidence shows use of the name or mark "Morgan Creek" for motion pictures or DVDs or CDs; on the contrary, the goods and services of the third-party uses are very different, while we may infer from the geographic evidence that "Morgan Creek" is not a well-known or frequently used place name.   Therefore, although "Morgan Creek" is not an invented term, and the various Morgan Creek company listings may be derived from creeks named Morgan, we treat opposer's mark MORGAN CREEK and design for motion pictures as a strong mark.

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and/or services.  See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).  See also, In re Dixie

---

[18]   We cannot ascertain in which state this Morgan Creek is located because applicant did not highlight it on the map, and the name of the place does not appear in large or bold type, thereby indicating that it is not a large city.

Restaurants Inc., 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997). Accordingly, we next consider degree of similarity between opposer's motion picture films and related DVDs and CDs, and applicant's clothing.

As opposer has pointed out, "the goods of the Opposer and the goods of the Applicant do not have to be competitive or even similar for a likelihood of confusion or mistake to arise." Brief, p. 20. It is sufficient that the respective goods or services are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same producer. See In re International Telephone & Telegraph Corp., 197 USPQ 910, 911 (TTAB 1978).

Opposer contends that this condition arises because:

> …motion picture theaters and clothing stores may be located in the same shopping malls and that sometimes a clothing store may be within 100 to 200 feet from the entrance to a motion picture theater in the mall. Consequently, the conditions exist for confusion, mistake, or deception to arise when patrons of the motion picture theater, on their way to or from a MORGAN CREEK film or on their way from having seen a trailer advertising a forthcoming MORGAN CREEK film, with the memory of the MORGAN CREEK mark and name fresh in their minds, or who have a recollection of the MORGAN CREEK & Design mark, enter a clothing store and see clothing marked with the words MORGAN CREEK OUTFITTERS.

22

> The natural inference that would arise in the minds of a customer under those circumstances would be that there is some sponsorship or affiliation or other relationship between the famous producer of motion pictures known as Morgan Creek and the clothing bearing the same mark, particularly since it is a practice of the motion picture industry to use articles of clothing as promotional and advertising merchandise, as Opposer does.

We are not persuaded by this argument. First, there is no evidence of record that it is a practice of the motion picture industry in general to use articles of clothing as promotional and advertising merchandise, let alone to promote their studio names or house marks in such a manner. As discussed infra, even the articles of clothing bearing opposer's house mark which opposer uses as promotional items are not directed to the general public. Second, we do not agree with opposer's suggestion that consumers who see a MORGAN CREEK film and shop for clothes within the same shopping mall are somehow more susceptible to confusion because the MORGAN CREEK logo will be "fresh in their minds." Rather, to the extent that there is a "fresh in their minds" factor, it is far more likely that it is the title of and actors in the movie, rather than the MORGAN CREEK logo, that will be associated with the film. This is especially so given that opposer's own movie posters depict the title and names of the actors in large print, while the MORGAN CREEK logo is shown in relatively small size. Third,

and most importantly, the mere fact that clothing of the type identified in applicant's application can be sold in a store in a mall, and that one of opposer's motion pictures can be shown in a movie theater in the same mall, is not a sufficient basis on which to find that the goods are related. It has long been held that the mere fact that two different items can be found in a supermarket, department store, drugstore or mass merchandiser store is not a sufficient basis for a finding that the goods are related. Recot Inc. v. M.C. Becton, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000) ("the law is that products should not be deemed related simply because they are sold in the same kind of establishments"); Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("A wide variety of products, not only from different manufacturers within an industry but also from diverse industries, have been brought together in the modern supermarket for the convenience of the customer. The mere existence of such an environment should not foreclose further inquiry into the likelihood of confusion from the use of similar marks on any goods so displayed"); Shoe Factory Supplies Co. v. Thermal Engineering Company, 207 USPQ 517, 526 (TTAB 1980) ("This contention [to equate different or unrelated goods by urging that they are all sold in supermarkets, department stores, and similar establishments] has been rejected…").

24

Here, opposer has gone beyond suggesting that there is a relatedness based on the goods being found in the same store, and has even gone beyond suggesting a relatedness between two establishments--a movie theater and an apparel store--in a mall; opposer is contending that the goods offered in the theater and the goods offered in the apparel store are related simply because both of the establishments in which the goods are offered can be located in the same mall. Under this reasoning, all items that could be sold in a mall would be considered related. And since malls sell a wide variety of items, opposer's position would essentially give it a right in gross, something that the trademark law prohibits. Carefirst of Maryland Inc. v. FirstHealth of the Carolinas Inc., 77 USPQ2d 1492 (TTAB 2005).

Similar comments apply to the similarity or dissimilarity of opposer's DVDs and CDs and applicant's goods. Although these items, too, may be sold in malls in which apparel is also sold, there is no evidence that clothing and DVDs or CDs are sold in the same stores. The mere fact that different products can be found in a mall, even products sold under similar marks, is not sufficient to find them related.

The determination that confusion is likely requires more than a theoretical possibility of confusion. See Electronic Design & Sales Inc. v. Electronic Data Systems

25

Corp., 954 F.2d 713, 21 USPQ2d 1388 (Fed. Cir. 1992), quoting Witco Chem. Co. v. Whitfield Chem. Co., 418 F.2d 1403, 1405, 164 USPQ 32, 44-45 (CCPA 1969) ("We are not concerned with mere theoretical possibilities of confusion, deception, or mistake or with de minimis situations but with the practicalities of the commercial world, with which the trademark laws deal"). However, opposer's argument that the parties' goods are related, and therefore that confusion is likely, appears to us to be theoretical at best.

In sum, we find that the parties' goods are dissimilar and not related. Moreover, the dissimilarity of the goods due to their nature, the manners in which they are sold or distributed, and the circumstances under which consumers would encounter them, is a dispositive factor in this case. See Kellogg Co. v. Pack'em Enterprises Inc., 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single *duPont* factor may not be dispositive"). See also, In re E.I. du Pont de Nemours & Co., 476 F.2d 1357, 1362, 177 USPQ 563, 567 (CCPA 1973) ("each [of the thirteen elements] may from case to case play a dominant role."). Thus, we find that applicant's mark MORGAN CREEK OUTFITTERS used on its identified clothing items is not likely to cause confusion with opposer's mark MORGAN CREEK and design for motion pictures, DVDs and CDs.

In reaching this conclusion we have considered applicant's goods as they are identified in the application, without any limitation to any particular channels of trade. Thus, we have deemed the clothing to be sold in all channels of trade appropriate for such goods, including stores located in shopping malls, and not only the Tractor Supply Company stores in which the goods are actually offered. Further, we recognize that applicant's goods include items that are not expensive and may be subject to impulse purchase. We also acknowledge that the marks are similar, in that both contain the name MORGAN CREEK, and that this term is the dominant element in both marks. However, the similarity of the marks and the conditions of purchase do not outweigh the differences in the goods. Quite simply, opposer has not shown that consumers would assume that applicant's identified clothing would emanate from or be sponsored by a company that makes motion pictures, DVDs and CDs.

Accordingly, we find that opposer has not proven a likelihood of confusion between applicant's mark MORGAN CREEK OUTFITTERS for clothing and opposer's mark MORGAN CREEK and design for motion pictures, DVDs and CDs.

As noted, in its notice of opposition opposer also pleaded use of its mark on clothing, and based its claim of likelihood of confusion in part on such use. In its brief

opposer did not discuss any common law rights it might have in the mark for clothing, and it is not clear whether opposer intended to pursue the ground of likelihood of confusion with respect to its use of its mark for clothing. However, in order to render a complete opinion, we find that opposer has not proved that it has trademark rights in the mark MORGAN CREEK or MORGAN CREEK and design for clothing. Opposer does not sell any clothing under the mark MORGAN CREEK or MORGAN CREEK and design. The clothing that bears these marks is given away as promotional items. "We use the T-shirts to put our logos on to advertise." Kaplan test., p. 106. Further, the clothing does not appear to be given to the public at large. For example, Mr. Kaplan thought that opposer distributed approximately 500 baseball jerseys with MORGAN CREEK PRODUCTIONS on it. They were given to "employees and friends of the company and people we want to give promotions to." Kaplan test., p. 91. He also said that they were never given out to the general public. Mr. Kaplan testified, in response to the question, "so this would be more of an intercompany [sic] type of promotion or gift," that "[m]ost of what we do is that, yes." Id. The shirts that opposer gives out at its annual employee meetings obviously are given to employees, and not to the public. Opposer also distributes t-shirts at the Cannes film festival, but opposer can derive no common law

28

trademark rights in the United States from use of a mark in France, even assuming that the distribution of promotional items would otherwise be sufficient to demonstrate trademark use.  Some unspecified number of these t-shirts are also distributed in the United States, but again, not to the public at large.  "We tend to hand these out both in France and in the United States to distributors and to friends of the company and to others as gifts."  Kaplan test., p. 65. The only other clothing items bearing a MORGAN CREEK mark that opposer put into evidence are baseball caps with the MORGAN CREEK logo on the front.  Mr. Kaplan testified that since 1997 thousands of these caps have been handed out as promotional items.  However, he did not identify the groups of people who received them, and given the general testimony about the distribution of promotional items, we must assume that they were given to the same category of people who got opposer's other promotional items--employees and friends of the company and people to whom opposer thought it was useful to give the promotional items.  Certainly we cannot conclude that they were distributed in any meaningful way to the public at large.

In Giersch v. Scripps Networks Inc., 90 USPQ2d 1020, 1023 (TTAB 2009), the Board stated that in order to establish common law rights in a mark for services the plaintiff must show that the services were "performed as a

29

regular or recurring activity associated with the mark."

Although in the present case we are dealing with goods,

rather than services, the same reasoning applies.  As the

Court of Customs and Patent Appeals stated in Squirtco v.

Tomy Corporation, 697 F.2d 1038, 216 USPQ 937, 939-40 (Fed.

Cir. 1983):

> SquirtCo overreached, seeking a holding
> that would bring within the ambit of
> protection of its mark SQUIRT for soft
> drinks virtually any goods which might
> be used as promotional items for that
> product. …To establish its theory,
> SquirtCo sought to introduce evidence
> of long and extensive sales of soft
> drinks under the mark SQUIRT and
> introduced evidence that it sold or gave
> away many types of items bearing the
> mark SQUIRT.  However, the evidence was
> too imprecise to show the quantum of use
> of SQUIRT on individual items, that it
> was continuous rather than isolated
> usage, or that the public has come to
> associate the mark SQUIRT with a
> particular item or a line of toys.

It is the burden of opposer to demonstrate that it has

used its mark in a regular or recurring manner so that the

consuming public would be aware that opposer offers the

goods under the mark and therefore associate opposer's mark

with the goods.  The testimony and evidence submitted by

opposer does not meet that burden.  There is no clear

information that opposer has distributed any clothing items

to the general public, let alone in any numbers to make an

impression, or that they have been distributed on a regular

or recurring basis.  Accordingly, we find that opposer has not established common law rights in its mark for clothing.

In view thereof, opposer cannot succeed on a claim of likelihood of confusion with respect to its use of its logo on clothing.

Decision:  The opposition is dismissed.  As stated in footnote 9, opposer must submit a redacted version of its appeal brief in which only truly confidential information is redacted, failing which the original brief will become part of the public record.